Intervenor Exhibit 1

Civ. No. 2:11-CV-00263-NDF

Katherine A. Meyer
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206

Timothy Kingston
408 West 23rd Street, Suite 1
Cheyenne, WY 82001-3519
(WY Bar No. 6-2720)
(307) 638-8885

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

ROCK SPRINGS GRAZING          )
ASSOCIATION,                  )
                              )
            Plaintiff         )
                              )
v.                            )          Civ. No. 2:11-CV-00263-NDF
                              )
                              )
KEN SALAZAR, ET AL.,          )
                              )
            Defendants.       )

**INTERVENOR-DEFENDANT OBJECTIONS TO PROPOSED CONSENT DECREE
FILED BY THE PLAINTIFF AND GOVERNMENT DEFENDANTS.**

The Intervenor-Defendants    International Society for the Protection of Mustangs and

Burros ("ISPMB"), American Wild Horse Preservation Campaign, and The Cloud Foundation

submit these objections to the proposed Consent Decree that was filed on February 12, 2013 by

the Plaintiff Rock Springs Grazing Association ("RSGA") and Defendants Bureau of Land

Management ("BLM") et al.[1]  As demonstrated below, because, as the government itself

---

[1] As RSGA, the government, and the caselaw make clear, as Intervenors of Right in this case, the wild horse advocacy groups are entitled to lodge and have considered such objections before the Court approves any such Decree.  See Johnson v. Lodge #93 of Fraternal Order of

previously argued in this case, this Court lacks jurisdiction over RSGA's claims, and because the proposed Decree "adversely affects the  legal rights and interests" of the Intervenor-Defendants in many respects, the Decree should not be approved by this Court.  Johnson v. Lodge #93 of the Fraternal Order of Police, 393 F.3d 1096, 1107 (10th Cir. 2004).[2]

## **BACKGROUND**

This case was brought by RSGA to obtain a Court Order requiring the BLM to remove all wild horses from the Wyoming Checkerboard, whether those horses are located on the private or public lands contained therein.  See Complaint at 31 (RSGA requested a Court Order that would declare that "BLM must remove all of the wild horses that have strayed onto the RSGA lands *and the adjacent public lands with the Wyoming Checkerboard*").  As RSGA's Complaint also makes clear, RSGA brought this case at the instruction of the Assistant Secretary for the defendant Department of the Interior who apparently advised RSGA that if it wanted the BLM to remove more horses from this area of the country it would need a Court Order requiring it to do so in order to obtain necessary additional appropriations from Congress for such actions.  See Complaint ¶ 70 ("The Assistant Secretary *stated that litigation would be necessary to secure additional funding for wild horse gathers*") (emphasis added).

Hence, from the very start of this case, it is clear that RSGA and the BLM planned to use

---

Police, 393 F.3d 1096, 1107 (10th Cir. 2004) ("an intervenor is entitled to present evidence and have its objections heard on whether [a court should] approve a consent decree."); accord, Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501 (1986).

[2] Rather than repeat all of the facts, law, and arguments that they included in their earlier brief in this case, the Intervenors hereby incorporate by reference that brief and all of the Administrate Record references cited therein.  See Intervenor Opening (June 27, 2012), Docket No. 65).

this litigation to obtain a court-approved Consent Decree that would require the agency to remove more wild horses from the Wyoming Checkerboard than is currently permitted under the existing laws and factual circumstances that apply to these matters.  Having negotiated and filed with the Court this new Consent Decree, without allowing the Intervenors to participate in any way as to the substance of the Decree, RSGA and the BLM have apparently achieved the purpose for which they initially colluded to bring this case.

Thus, they ask the Court to approve and enforce a Consent Decree under which the BLM makes commitments to RSGA to remove not only all wild horses from the lands that are privately owned or leased by RSGA, but also wild horses that currently use the more than one million acres of *public* lands in the Wyoming Checkerboard as well.  Under the Decree, the BLM commits to *remove all wild horses*   i.e. to "gather to zero wild horses" in the Salt Wells Herd Management Area ("HMA") and the Divide Basin HMA; to manage the Adobe Town HMA Appropriate Management Level ("AML") for "225-450 wild horses *or lower*;" and to "[m]anage the White Mountain HMA as a *non-reproducing herd* . . . of 205 wild horses," and to "initiate gathers if the population exceeds 205 wild horses."  Consent Decree at 6-7 (emphasis added).[3]

---

[3] Pursuant to the Wild Horse Act's provision that the BLM "may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation," id. § 1333(a), by regulation the BLM has defined herd management areas ("HMAs") as areas "established for the maintenance of wild horse and burro herds."  43 C.F.R. § 4710.3-1.  In determining whether wild horses should remain in an area of public lands the BLM "shall consider the appropriate management level for the herd, the habitat requirements of the animals, [and] the relationships with other uses of the public and adjacent private lands."  Id.  The appropriate management level ("AML") is "expressed as a population range within which [wild horses] can be managed for the long term" in a given management area without resulting in rangeland deterioration.  See BLM Handbook at 4.2.1; see also 16 U.S.C. § 1333(b)(1) (authorizing the BLM to determine AMLs).  In establishing, evaluating, or adjusting an AML for

As demonstrated below, because this Consent Decree adversely affects the legal rights and interests of the Intervenors, it should not be granted.  Instead, for the reasons provided in the Intervenor's Opening Brief, this case should be dismissed.

## OBJECTIONS

As demonstrated below, because the Consent Decree as currently drafted "adversely affects the legal rights and interests" of the Intervenor-Defendants in many respects, it should not be approved by this Court.  Johnson v. Lodge #93 of the Fraternal Order of Police, 393 F.3d 1096, 1107 (10th Cir. 2004).

### 1.    The Court Lacks Subject Matter Jurisdiction Over This Matter And Hence Has May Not Approve The Consent Decree.

It is well established that a Court lacks subject matter jurisdiction over a case if the Plaintiff is unable to demonstrate that it has Article III standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  One of the essential components of this constitutionally required demonstration is the ability to allege and eventually demonstrate that the plaintiff's claims are redressable is some respect.  Id, at 561.  Here, however, as both the Intervenor Defendants and the *government* explained to the Court in their briefs in this case    and the government itself stressed at the oral argument on September 17, 2012    RSGA did not present any claims for which this Court can grant any relief.  See Intervenor Opening Brief ("Int. Brf.") at 22-32; Federal Government's Opening Brief ("Gov't Brf.") at 20-21; see also Transcript of September 17, 2012 Hearing (Attached as Exhibit A) at 22-33  (government counsel contending that the

---

a given management area, the BLM must "include an in-depth evaluation of intensive monitoring data or land health assessment . . . . includ[ing] studies of grazing utilization, range ecological condition and trend, actual use, and climate (weather) data [as well as] [p]opulation inventory, use patterns and animal distribution."  BLM Handbook at 4.2.2.1, 4.2.2.2 (emphasis added).

Court lacks jurisdiction over RSGA's claims); id. at 35-38 (Intervenor counsel explaining that there is no relief available to RSGA).  Accordingly, the Court has no authority to approve the Consent Decree.  *See*, *e.g.*, <u>Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland</u>, 478 U.S. 501 (1986).

As the Intervenors and the government both explained to the Court, in the wake of <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 66-67 (2004), RSGA cannot obtain a Court order requiring the BLM to remove any horses from the *public* lands, because the BLM has wide discretion with regard to its "broad statutory mandate" to "manage wild free-roaming horses and burros," under the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§1331-1340. <u>See also</u> Int. Brf. at 22-32; Gov't Brf at 20-21.  As the Intervenors and the government also demonstrated, the only arguable viable claim RSGA could assert to obtain any relief in this case is one claiming that the government has "unreasonably delayed" removing horses from the *private* lands that are located in the Wyoming Checkerboard.  <u>See</u> Int Brf. at 28-32; Gov't Brf. at 42-43.  However, RSGA did not present any such claim in its Complaint, and, at the oral argument on September 17, 2012, counsel for RSGA emphatically stressed that RSGA was *not* presenting such a claim in this case.  <u>See</u> Transcript at 46 ("we did not plead unreasonable delay for the simple fact [that] we're not arguing delay"); id. at 44 ("[i]t is not a question of unreasonable delay").

Therefore, because RSGA has not asserted any viable claim for relief in this case, it cannot demonstrate the requisite redressability that would provide this Court with Article III jurisdiction over this matter.  Accordingly, the Court should not allow RSGA and the government to obtain a court approved order to take actions  at the expense of the rights and

interests of the Intervenors in a case over which the Court lacks jurisdiction to approve the Decree and oversee its implementation.

### 2.    The Removal Of Horses From The "Private" Lands Adversely Affects The Legal Rights And Interests Of The Intervenors.

The proposed Consent Decree clearly affects the legal rights of Intervenor ISPMB, which, as RSGA admits, was a party to an earlier "agreement" under which RSGA agreed to keep 500 horses on the "private" lands in the Checkerboard, see RSGA Opening Brief (Docket No.    ) at 14-15, 34   an agreement that was incorporated as part of the AMLs that were set by the Green River Resource Management Plan, which is binding on the BLM unless and until it is amended pursuant to the laws that apply to such amendments.  See Int. Brf. at 9-11.   Indeed, that ISPMB was a party to this agreement was one of the bases upon which this Court held that ISPMB had a right to intervene in this case pursuant to Federal Rule 24(a).  See Order Granting Motion to Intervene (November 2, 2011) (Docket No. 32) at 5 ("Indeed, *ISPMB was a party to the 'agreement' referenced throughout the Petition [] of which RSGA seeks a unilateral rescission, and movants have a legally protectable interest in protecting the wild horses that live in these areas*") (internal citations omitted) (emphasis added).  Accordingly, the BLM's purported agreement to remove *any* of those horses from the Checkerboard, even from the *private* lands, cannot be done without the approval of ISPMB and an amendment to the RMP.

In this regard, while the proposed Consent Decree notes that the agreement to keep 500 horses on private lands was conditioned on "BLM [proving] that they [sic] are capable of managing the wild horses with respect to numbers of horses to be allowed in the Rock Spring District," Consent Decree at 2, conspicuously, BLM has *not* admitted either in the Decree, its

-6-

joint motion to dismiss, or anywhere else that this condition has been met.  On the contrary, as

both the Intervenors and the government itself explained in their briefs in this case, that pre-

requisite for removing any of those horses from the private lands simply has not been met.  See

Intervenor Brf. at 16-21; Gov't Brf. at 21-25.  In fact, after an extensive investigation of the

entire Wild Horse and Burro program, the Government Accounting Office concluded that "*BLM

has made significant progress in setting and meeting AML [Appropriate Management Level] for

the HMAs*" throughout the public lands, including in Wyoming.  See GAO Report (AR 03752) at

7, 23, 24.

Indeed, as explained by Lloyd Eisenhauer, a former BLM official who worked in the

Rock Springs District for almost twenty-five years, "BLM has generally proven capable of

removing wild horses in the Rock Springs District, including by responding to emergency

situations when needed and removing horses when necessary due to resource damage."

Declaration of Lloyd Eisenhauer (attached as Exhibit B) at ¶ 6.  Therefore, the only evidence that

has been produced on this point shows that, in fact, BLM has made major strides in managing

these horses, including by removing thousands of wild horses from this District in recent years.

See Int. Brf. at 16-18.

Furthermore, as RSGA itself has stressed, because of the configuration of the

Checkerboard, there simply is no practical way to differentiate between horses that are on the

*private* lands versus those that are on the *public* lands at any one point in time.  See Map of

Checkerboard (AR 02130 ); see also RSGA Brf. at 39 (stating that RSGA "cannot fence the

horses out without unlawfully fencing public lands and harming wildlife").  As Mr. Eisenhauer

explains:

> due to state laws, property lines, and intermingled lands, it is impossible
> to fence the lands of the Wyoming Checkerboard, which means that both
> the wild horses and the livestock that graze there roam freely between
> public and private lands on the Checkerboard without any physical barriers.
> For this reason, *it is illogical for BLM to commit to removing wild horses*
> *that are on "private" lands RSGA owns or leases because those same horses*
> *are likely to be on public BLM land* (for example, the Salt Wells, Adobe
> Town, Great Divide, and White Mountain HMAs) *earlier in that same day*
> *or later that same evening.*

Eisenhauer Decl. at ¶ 4 (first emphasis added, second emphasis in original).  As this former BLM

official further explains, "in contrast to other areas of the country where wild horses still exist, on

the Wyoming Checkerboard *there is no way to distinguish between horses on 'private' lands and*

*those on public lands*, and therefore it would be unprecedented, and indeed *impossible for BLM*

*to contend that it is removing all horses on RSGA's 'private' lands at any given time of the year,*

*months, or day, considering that those horses would only be on the strictly 'private' lands very*

*temporarily and intermittently on any particular day*."  Id. (emphasis added).

Therefore, even the part of the Consent Decree in which BLM commits to remove horses

only from the *private* lands infringes on the rights of *all* of the Intervenor groups, who, as the

Court recognized when it granted their intervention in this case, have strong interests in

maintaining wild horses on the public lands to the greatest extent possible and consistent with all

of the requirements of both the Wild Horse Act and the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321- 4370(f).  See Order Granting Motion to Intervene at 5 (noting as

to the "interest" test for Rule 24(a) that "[c]ertainly the relief requested by Plaintiff would impact

the number of wild horses roaming the Wyoming Checkerboard on both private and public

lands" and that for this reason also "movants have a legally protectable interest in protecting the

wild horses that live in these areas").

-8-

Thus, as the Intervenors explained in their brief, the AMLs are decided as part of the BLM's broader "resource plan" for the public lands in question   a planning process that requires public notice and comment, as well as review under the requirements of NEPA. See Int. Brf. at 6; see also Fund for Animals, Inc. v. U. S. Bureau of Land Management, 460 F.3d 13, 16 (D.C. Cir. 2006) (the "appropriate management levels [AMLs]" for wild horses are "*determined through BLM's planning process* to be consistent with the objective of achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular herd area") (citing 16 U.S.C. § 133(b)(1)) (emphasis added); 43 C.F.R. § 4710.1 ("[m]anagement activities affecting wild horses and burros . . . *shall be in accordance with approved land use plans*") (emphasis added); BLM Handbook (June 2010) at 4.2.2 (("[a]n interdisciplinary and *site-specific environmental analysis and decision process (NEPA) with public involvement is required to establish or adjust AML*") (emphasis added).

Accordingly, because there is no way for BLM to legitimately identify those horses that are on *private* lands in the Wyoming Checkerboard from those that are using the *public* lands, absent more information about how this crucial determination will be made on any particular day, the agency's commitment "to remove *all* wild horses located on RSGA's private lands, including Wyoming Checkerboard lands,"Consent Decree ¶ 1 (emphasis added), without complying with the laws that apply to decisions regarding the removal of any horses from the *public* lands, also adversely affects the Intervenor's rights and interests. See also 43 C.F.R. § 4720.2-1 (BLM regulations stating that private landowner requesting removal of wild horses "shall . . . indicate [in writing] the numbers of wild horses or burros [and] the date(s) the animals were on the land").

-9-

**3.      The Removal Of Horses From The Public Lands As Contemplated By The Consent Decree Adversely Affects Intervenors' Legal Rights And Interests**.

For the same reason, BLM's agreement embodied in the Consent Decree to remove horses from the *public* lands also adversely affects the right and interests of the Intervenors which are premised on keeping wild horses on the Wyoming Checkerboard to the greatest extent permitted by law, and until and unless BLM can make the "excess" determination required by the WHA, 16 U.S.C. § 1333(b)(1).  See also Colo, Wild Horse & Burro Coal. v. Salazar, 639 F. Supp. 2d 87, 98 (D.D.C. 2009) ("A prerequisite to removal under the Wild Horse Act is that *BLM first determine that an overpopulation exists and that the wild free-roaming horses and burros slated for removal are 'excess animals.*'") (emphasis added).

Because these statutorily required decisions have not yet been made pursuant to the statutes and authorities that govern here    and these decisions *cannot* be made without compliance with those governing laws    BLM cannot lawfully agree to any of the provisions regarding removal of horses from the *public* lands.  For example, the Consent Decree provides that "[i]f BLM determines . . . that the wild horse population in the Adobe Town or White Mountain HMAs is likely to exceed the respective AML, the *BLM shall adjust its annual work plan to gather and remove excess wild horses from the HMA(s) so that the population is reduced to the low end of AML*."  Consent Decree at ¶ 4 (emphasis added).  It further provides that "[i]f BLM determines . . . that the population in the Checkerboard lands is likely to exceed 200 wild horses for Salt Wells/Adobe Town Areas combined or 100 wild horse for Divide Basin, the BLM *shall prepare to remove the wild horses from Checkerboard lands within the respective areas*." Id. (emphasis added).  Yet, not only has BLM not made the statutory findings that are required

under the WHA to make such commitments, in reaching its agreement with RSGA it also has not complied with *any* of the requirements of NEPA.

Thus, the agency has not even prepared an Environmental Assessment, let alone determined that its decisions to remove *all* of the wild horses from several of the HMAs on the public lands on the Checkerboard and reduce  remaining populations to either the "low AML" or a fixed number of horses in a "non-reproducing" herd, see CD at  ¶ 6, is not an action that may significantly affect the environment and hence require the preparation of an Environmental Impact Statement ("EIS").   See 42 U.S.C. § 4332(C) (federal agencies "shall" prepare" an "Environmental Impact Statement" with respect to all "major Federal actions significantly affecting the quality of the human environment.").  Nor, given the various "significance" factors that the agency must taken into account in making such decisions, could it possibly conclude that the actions it has agreed to do not require the preparation of the EIS.  See, e.g. 40 C.F.R. § 1508.27(b) (factors rendering an agency action "significant" and hence requiring preparation of an EIS include the degree to which the effects on the environment "are likely to be highly controversial;" the degree to which "the possible effects" are "highly uncertain or involve unique or unknown risks;" the degree to which the action "may establish a precedent for future actions with significant effects;" the degree to which the action "may cause loss or destruction of significant scientific, cultural, or historical resources;" and whether the action "threatens a violation" of federal law); id. at § 1508.27(b)(1) (the agency must consider "[i]mpacts that may be both beneficial and adverse"); see also Fund for Animals v. Norton, 281 F. Supp. 2d 209, 218 (D.D.C. 2003) ("the presence of one or more of [the significance] factors should result in an agency decision to prepare an EIS") (other citations omitted).

Indeed, in two other recent cases BLM withdrew decisions to geld and return male wild horses to certain HMAs, including the White Mountain and Little Colorado HMAs that are located in the Wyoming Checkerboard, after wild horse advocacy groups, including some of the Intervenors, filed suit on the grounds that the agency had failed to consider certain important environmental impacts of those decisions     including that converting wild male horses to geldings destroys their wild and free-roaming characteristics, and has negative social impacts on the herd as a whole     and on the further grounds that such actions, including the zeroing out of an entire herd or wild horses, requires the preparation of an EIS.  See  Am. Wild Horse Pres. Campaign v. Salazar, 800 F. Supp. 2d 270 (D.D.C. 2011) (BLM withdraws its decision to geld and return wild horses); Am.Wild Horse Pres. Campaign v. Salazar, No. 11-2222 (D.D.C), Dkt. No. 29 (BLM requested voluntary remand of decision to zero out one wild horse population and use gelding in another after the plaintiffs argued that such actions require preparation of an EIS); see also Declaration of Allen Rutberg ¶ 13 (attached as Exhibit C ) (explaining that returning large numbers of castrated males to these herds "would create a semi-free- roaming herd of domestic horses on public lands," rather than the "true 'wild,' 'free-roaming' horses" that are required by the WHA); id. ¶ 17 "*[t]he proposed herds will no longer be 'wild horses' from a conservation, population ecology, or behavioral viewpoint*," because the geldings will simply "not participate in [the] fundamental processes of wild horse behavior," such as "trying to protect mares from harassment by other stallions to secure exclusive reproductive access to the mares for themselves") (emphasis added); id. ¶ 18 ("[t]he castrated males *will also not retain their 'free- roaming nature,'*" because "these horses will not be hormonally prompted to protect their mares, compete with other stallions for reproductive mates, or cover as much geographical distance as

-12-

they would in their natural state" [and] "[t]he *castrated horses will behave much more like domesticate horses, with diminished aggressiveness and competitiveness*.") (emphasis added).[4]

Therefore, because the Consent Decree similarly includes commitments to use fertility controls, including gelding and other forms of sterilization to suppress the population growth of the wild horses on the Checkerboard, see Decree at 6, and to completely convert the White Mountain HMA to a "non-reproducing herd," id. at 7, these actions simply may not be taken without considering the adverse impacts this will have on the individual horses as well as the herds as a whole, and without preparing an EIS with respect to each such action. As the Supreme Court has reaffirmed, NEPA is "intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States. Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).  However, in contrast to substantive statutes such as the WHA, "'NEPA itself does not mandate particular results' in order to accomplish'" its goal of increased environmental protection. Pub. Citizen, 541 U.S. at 756 (citation omitted).  Rather, the "NEPA EIS

---

[4] See also Declaration of Dr. Anne Perkins (Exhibit D) at ¶ 6 ("*[t]here is no doubt that castrating stallions and releasing them back into the herd as geldings (castrated males) will change the behavior of both the individual horses and the herd itself . . . A castrated male will not exhibit the 'wild' or 'free-roaming' nature that is evidence in fully-intact stallions*") (emphasis added); Declaration of Dr. Bruck Nock (Exhibit E) at ¶ 18 ("Returning castrated males to the White Mountain and Little Colorado Herd HMAs *will change the natural order within the herd and will disrupt the herd's viability.  There is no reason to believe a herd of such an artificial composition will be stable or self-sustaining.*") (emphasis added); Declaration of Dr. Jay Kirkpatrick (Exhibit F) at ¶ 8 ("[t]he very essence of the wild horse . . . is the social organization and social behaviors. Geldings (castrated male horses) *no longer exhibit the natural behaviors of non-castrated stallions*," and "gelded stallions will not keep their bands together, which is an integral part of a viable herd.  These *social dynamics* were molded by millions of years of evolution, and *will be destroyed* if the BLM returns castrated horses to the HMAs") (emphasis added).

-13-

requirement" is designed to inject environmental considerations "in the agency decisionmaking process itself," and to "'*help public officials make decisions that are based on understanding of environmental consequences*, and take actions that protect, restore, and enhance the environment.'" Id. at 768-69 (quoting 40 C.F.R. § 1500.1(c)) (emphasis added). In other words, NEPA compliance is intended to *inform* the agency's actual decisions about what actions it should take    it is not intended as a pro forma exercise designed to rubber stamp decisions that the agency has already decided upon.

**4.     The Mere Inclusion Of References To The NEPA Process Can Not Negate The Fact That BLM Is Pre-Disposed To Fulfill The Commitments It Has Made To RSGA In The Decree.**

The mere fact that the Consent Decree purports to preserve some of these rights and interests by stating that each of the actions to remove horses from the public lands will be subjected to "scoping under NEPA," Consent Decree at 6, and that "[n]o provision of this Consent Decree shall be interpreted or constitute a commitment or requirement that the Respondents take actions in contravention of the WHA, FLPMA, [or] NEPA," id. at 11, does not cure this problem. While the parties to the Decree want to make it look like they these actions will not necessarily be taken, depending on the outcome of the NEPA process, clearly the agency has made a commitment to RSGA to take these various actions to remove wild horses from the Wyoming Checkerboard    a commitment that RSGA and BLM seek to make enforceable by this Court. See Consent Decree at ¶ 8. (emphasis added).

Indeed, in this very case RSGA has attempted to use a previous "Court Order" to trump the rights and interests of the Intervenors    and other members of the public    by arguing that such court-approved settlements can be enforced through a *writ of mandamus*. See RSGA Brf. at

20-30 (contending that it is entitled to a writ of mandamus to enforce a 1979 settlement

agreement, 1981 Court Order, and 1982 Amendment Agreed to by the Parties); see also Am.

Wild Horse Preservation Campaign v. Salazar, 800 F. Supp. 2d 270 (D.D.C. 2011), Civ. No.   ,

Docket No. Docket No. 9-1 (State of Wyoming contends that it has a "significant interest . . .

because the relief requested in [that[ case *directly conflicts with the BLM's obligations under an*

*existing Consent Decree between the State and the BLM to provide for AML in the White*

*Mountain and Little Colorado HMAs*") (emphasis added).

      However, as the Court of Appeals for the Ninth Circuit has explained, an agency violates

NEPA when it makes a commitment to engage in a particular course of action *before* going

through the NEPA process.  See Metcalf v. Daley, 214 F.3d 1135, 1143-44 (9th Cir.2000).  In

that case the National Oceanic and Atmospheric Administration ("NOAA") entered into a

contract with the Makkah Indian Tribe in the Pacific Northwest under which it agreed to "work

with" the Tribe to obtain an exemption from the International Whaling Commission that would

allow the Makkah to hunt gray whales that were otherwise covered by a ban on hunting due to

the precarious state of the species.  The court found that such governmental commitments made

prior to compliance with NEPA violated that important environmental statute  by pre-disposing

the federal agency to a particular outcome.  As the court explained in that case, "the record makes

clear that the Federal Defendants did not even consider the potential environmental effects of the

proposed action *until long after they had already committed in writing to support the Makkah*

*whaling proposal,*"  214 F.3d at 1143 (emphasis added), and that, "[b]y the time the Federal

Defendants completed the final [Environmental Assessment] in 1997, *the die already had been*

*cast* . . . the contracts here amounted to a surrender of the Government's right to prevent activity

in the relevant area." Id. at 1144 (emphasis added).  Thus, the court held that "by making such a firm commitment before preparing an EA, the Federal Defendants failed to take a 'hard look' at the environmental consequences of their actions, and, therefore violated NEPA. Id. at 1145; see also Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) (NEPA was enacted to "insure that the agency has taken a 'hard look' at [the] environmental consequences" of its actions).

Similarly, although BLM has gone through the motions of claiming that some of the commitments contained in the Consent Decree are subject to the outcome of the NEPA processes that necessarily apply to these decisions, it is clear that "the die already had been cast" with respect to the agency's plans to remove hundreds of horses from the public lands in the Wyoming Checkerboard to appease the concerns of the private livestock owners.  Metcalf v. Daley, 214 F.3d at 1143; see also, e.g., Consent Decree at ¶ 6(a)  "if BLM determines there are more than 200 wild horses within [Salt Wells] . . . the area *will be re-gathered to zero wild horses*" (emphasis added); id. at ¶ 6(b) ("if BLM determines there are more than 100 wild horses within the [Divide Basin] . . . *the area will be re-gathered to zero wild horses*") (emphasis added). Accordingly, this Court should not provide its judicial imprimatur to a Consent Decree, the enforcement of which will necessarily result in numerous violations of the laws that apply to the decisions that the government is agreeing to make *before* it has even initiated those processes, let alone complied with them.[5]

---

[5] The Consent Decree further states that "[a]bsent census data" that determine *actual* population numbers that trigger various commitments under the Decree, "the parties agree that until otherwise established and agreed, the population levels in the future will be estimated by assuming a projected reproduction rate of 20% annual increase in herd size."  Consent Decree at 6.  However, as the Intervenors explained in their brief, there is no basis for this assumption.  See Int. Brf. at 18-19.

5.       **The Proposed Consent Decree Unlawfully Elevates Livestock Use
         Over Protection Of Wild Horses.**

The Consent Decree also adversely affects the rights and interests of the Intervenors in

this case by illegally elevating the interests of private livestock owners over the interests of those

who cherish the opportunity to observe, photograph, and otherwise enjoy what Congress has

declared a "national esthetic treasure" when it enacted the WHA.  See Senate Rep. No. 92-242

(June 25, 1971) at 1; see also 16 U.S.C. § 1331 ("wild free-roaming horses and burros are living

symbols of the historic and pioneer spirit of the West" that "contribute to the diversity of life

forms within the Nation and enrich the lives of the American people"); see also id. (wild horses

and burros are to "be considered in the area where presently found [] as an integral part of the

natural system of the public lands") (emphasis added).

Thus, as the Intervenors have explained, see Int Brf. at 8, pursuant to the Taylor Grazing

Act ("TGA"), the government has broad *discretion* to decide whether to allow livestock owners to

use the public lands    i.e., the issuance of a grazing permit does not confer any entitlement or right

to use the public lands; rather, it is a privilege that can be taken away if necessary to protect the

health of the range and even if necessary to protect the wild horses.  See 43 U.S.C. § 315b (BLM,

is "authorized" to issue permits for the grazing of livestock on public lands "upon the payment . . .

of reasonable fees" ); id. ("the creation of a grazing district or the issuance of a [grazing] permit . .

. *shall not create any right, title, interest, or estate in or to*" these public lands.  Id. (emphasis

added); see also United States v. Fuller, 409 U.S. 488, 494 (1973) ("The provisions of the Taylor

Grazing Act . . . make clear the congressional intent that no compensable property might be

created in the permit lands themselves as a result of the issuance of the permit"); Fed. Lands Legal

-17-

Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1196 (10th Cir. 1999) ("A grazing permit . . . gives the permittee merely a license to use federal land, *not a vested right in that land*."); id. at 1198 ("[T]he very determinations of whether to renew grazing permits and whether public lands should even be designated for grazing purposes . . . are matters completely within the Secretary of Interior's discretion.") (citations omitted) (internal quotations omitted).

Indeed, the TGA also provides that the Secretary "is authorized, in his discretion, to . . . classify any lands within a grazing district, which are . . . more valuable or suitable for any other use, "43 U.S.C. § 315f, including use by wild horses that are <u>required</u> to be protected under the WHA.  <u>See</u> 16 U.S.C. § 1333(a); <u>see also</u> 43 C.F.R. § 4710.5(a) (BLM may prohibit grazing on the public lands where necessary to protect the wild horses).

Yet, the entire Consent Decree presents the opposite view of the law    it makes the rights of the wild horses to exist on these public lands subservient to the financial interests of the livestock owners who wish to continue to use these very same lands for their own private economic gain and who do not believe that the wild horses compete with livestock for the resources that are available there.  Thus, as former BLM official Eisenhauer explains:

> Traditionally, BLM officials (myself included) have understood that, pursuant to the Wild Horse Act, wild horses have a right to use BLM lands, so long as their population numbers do not cause unacceptable damage to vegetation or other resources.  In stark contrast, however, *livestock (sheep and cattle) have no similar right to use BLM lands; rather, livestock owners may be granted the privilege of using BLM lands for livestock grazing pursuant to a grazing permit that is granted by BLM under the Taylor Grazing Act, but that privilege can be revoked, modified, or amended by BLM for various reasons, including for damage to vegetation or other resources caused by livestock, or due to sparse forage available to sustain livestock after wild horses are accounted for.  BLM's [Consent Decree] does the opposite and instead prioritizes livestock over wild horses, by proposing to remove hundreds*

-18-

> *of wild horses from the Wyoming Checkerboard without reducing livestock numbers.*

Eisenhauer Decl. at ¶ 5 (emphasis added).

This flagrant reversal of the applicable laws is particularly egregious for several additional reasons.  First, as the record in this case shows, it is the livestock   not the horses   that are causing the most serious damage to the public lands in Wyoming, even though such damage is the underlying basis cited in the Consent Decree for the purported need to remove hundreds of wild horses.  See Consent Decree at 3 (noting that "BLM adopted regulations governing standards for rangeland resources, including managing for the health of native vegetation and riparian areas" and that "wild horses utilize the range year round and, due to greater availability of water on the Checkerboard and topography, the wild horses spend much of each year on the Checkerboard").

Thus, as the Intervenors demonstrated, Int. Brf. at 21, according to the BLM's own official "rangeland health assessment" documents, the tens of thousands of cattle and sheep that are permitted to roam these public lands are causing serious damage to these resources   damage that BLM is required by statute to take into account in deciding how best to balance the use of this land by both wild horses and livestock.  See AR 04115 ("Wyoming Rangeland Standards Conformance Review Summary" for the "Rock Springs" Allotment identifying "Livestock Grazing" as an important "factor" related to the deterioration of "the proper functioning" of riparian areas and their ability "to produce native riparian vegetation"); see also id. at AR 04117 (stating that grazing management practices "*hinder the completion of plants' life-sustaining reproductive and/or nutrient cycling processes*") (emphasis added); 16 U.S.C. § 1332 (f) (requiring BLM "to preserve and maintain a thriving natural ecological balance" on the public

-19-

lands); BLM Handbook at 4.2.2.1 (BLM's determination of AMLs must be based on "an in-depth

evaluation of intensive monitoring data or land health assessment . . . . includ[ing] <u>studies of</u>

<u>grazing utilization</u>") (emphasis added).

Indeed, Mr. Eisenhauer    who has studied and observed these issues for more than 50

years    explains that "wild horses tend to hang out in the uplands at a greater distance from water

sources until they come to briefly drink water every day or two, *whereas livestock congregate*

*near water sources and riparian habitat causing concentrated damage to vegetation and soil*. For

this reason, the impacts of wild horses are far less noticeable on the Checkerboard than impacts

from livestock."  Eisenhauer Decl. at ¶ 7 (emphasis added).  As Mr. Eisenhauer further explains:

> because livestock tend to eat somewhat different forage than wild horses
> (horses tend to eat coarser vegetation such as Canadian wild rye and other
> bunch grasses, whereas cattle and sheep mostly eat softer grasses), *there is no*
> *justification to remove wild horses on the basis that insufficient forage exists to*
> *support the current population of wild horses*.

Eisenhauer Decl. at ¶ 8 (emphasis added).  He also explains:

> because cattle and sheep have no front teeth on the front part of their
> upper jaws, they tend to pull and tear grasses or other forage out by the
> root causing some long-term damage to vegetation, whereas wild horses,
> which have front teeth on both their front upper and lower jaws, act more
> like a lawnmower and just clip the grass or forage (leaving the root un-
> injured), allowing the vegetation to quickly grow back.

<u>Id.</u> (emphasis added).

Thus, as he concludes, "[t]hese differences are extremely significant because *if there were*

*a need to reduce the use of these BLM lands by animals to preserve these public lands, it might be*

*cattle and sheep    not wild horses    that should be reduced to gain the most benefit for the lands*,

and which is why BLM, during my time as an agency official, focused on reducing livestock

grazing.  Id. (emphasis added).  See also Rangeland Resource Report (Exhibit G) (concluding that "[r]emoving a large percentage of the wild horses [from the White Mountain and Little Colorado HMAs] is not likely to result in an improvement of range condition since the percentage of forage allocated to wild horses is very small compared to the amount of forage allocated to livestock. (The forage allocation for wild horse use is only 2% to 3% of the total forage allocation for these HMAs)"); id. (explaining that "many of the water sources in these HMAs are turned on and off to accommodate livestock use only, which reduces the number or water sources available for wild horse use in summer months . . . [which] forces the wild horses to congregate in areas where water is available").

Second, as the Intervenors also demonstrated, the livestock owners use these public resources    at taxpayer expense    for a fraction of what it would cost to obtain them in the private commercial market.  See Int. Brf. at 19-20; see also Congressional Research Service Report (Exhibit C to Int. Brf. ) at 1 (concluding that BLM and the U.S. Forest Service "are charging a grazing fee of $1.35 per AUM [animal unit months] through February 29, 2012 "    the "*lowest fee that can be charged*" and "*generally lower than fees charged for grazing on other federal lands as well as on state and private lands.*") (emphasis added); see also id. (noting that "other federal agencies charged $0.29 to $112.50 per AUM in 2004," and that "most agencies charge a fee based on competitive methods or a market price for forage."); id. at 2 ( "BLM and the FS typically spend *far more managing their grazing programs than they collect in grazing fees,*"with one study estimating "the federal cost of an array of BLM, FS, and other agency programs that benefit grazing or compensate for impacts of grazing at roughly *$500 million annually*" in taxpayer dollars. (Emphasis added); see also BLM Press Release (Jan. 31, 2003) (Exhibit H) (announcing

that it is again charging only $1.35 per animal unit month for grazing on public lands).

Finally, the Consent Decree's commitment to zero out the Salt Wells and Divide Basin wild horse populations for no reason other than to open *more* public land for livestock grazing is patently inconsistent with the governing legal mandates that govern here and, as a result, will wreak havoc on the resources of these public lands.  As former BLM official Lloyd Eisenhauer explains:

> BLM has no biological or ecological basis for zeroing out a herd of wild horses in an HMA that existed at the time the wild horse statute was passed in 1971, as is the case with both the Salt Wells and Divide Basin HMAs. . . .
>
> The zeroing out of wild horses in the Salt Wells and Divide Basin HMAs is also concerning because it would mean that, in those two longstanding HMAs, there would no longer be the "multiple use" of these public lands as required by both the Wild Horse Act and the Federal Land Policy and Management Act. Currently, while there are other uses of this public land . . . the two *primary* uses in those HMAs are by wild horses and livestock. If BLM proceeds with its agreement with RSGA to zero out wild horses in those HMAs, the only major use remaining wold be livestock use . . . Not only will that potentially undermine the laws that BLM officials must implement here, but it has practical adverse effects on the resources multiple use is very beneficial for the environment, and particularly sensitive vegetation, because different users (e.g., livestock, wild horses) use the lands and vegetation in different ways.  When that is eliminated, the resources are subjected to an unnatural use of the lands which can cause severe long-term damage to the vegetation.  *As a result, zeroing out these herds would likely be devastating for the vegetation in these two HMAs, because livestock would be by far the predominant use in this area*.

Eisenhauer Decl. ¶¶ 10-11 (emphasis added).


**5.     Compliance With This Consent Decree Will Have Extreme Consequences For The Wyoming Wild Horses.**

The Consent Decree, if approved, will have extreme consequences for the wild horses that

are currently roaming free on the public lands of the Wyoming Checkerboard.  In fact, it will affect more than 50% of Wyoming's remaining wild horse population and over 50% of currently designated wild horse habitat on BLM-managed lands in Wyoming.  In addition, the Decree proposes to entirely eliminate more than one-third of the current allowable wild horse population in the state.  These are extreme measures that will not only negatively impact the Intervenors' interests but will have long-standing and devastating consequences for Wyoming's wild horses.  Thus, the Decree is contrary to the intent of the WHA which was unanimously enacted by Congress in 1971 to protect wild horse and burros "in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

Specifically, the two HMAs targeted for total elimination of horses    Great Divide Basin and Salt Wells    comprise 1.25 million acres of the 3.6 million total acres managed by the BLM for wild horses in Wyoming.  See BLM Herd Statistics (Exhibit I).  In addition, it proposes to sterilize all horses in the White Mountain HMA, comprised of 207,372 acres managed by BLM.  This federally-protected wild horse population would no longer be self sustaining, as required by the Act, and would destroy this herd's wild and free-roaming behaviors, thus rendering them no longer "part of the natural system of the public lands." 16 U.S.C. § 1331; see also supra at 12-13.

The removal of hundreds of wild horses from the Wyoming Checkerboard and the "zeroing-out" of entire populations, as contemplated by the Consent Decree will also have extremely inhumane consequences for these animals who are supposed to be maintained as "wild" and "free-roaming" on the public lands of the west as much as possible.  See 16 U.S.C. § 1331.  As the 2008 GAO Report explained, "[t]he number of wild horses and burros removed from the range *is far greater than the number adopted or sold, which has resulted in a significant increase*

-23-

*in the number of animals in short- and long-term holding*." GAO Report at   (AR 03752)

(emphasis added).  Thus, the Report explained, "[s]ince 2001, over 74,000 animals have been

removed from the range, while only about 46,000 have been adopted or sold."  Id. at (AR 03753).

In the intervening years since that Report was prepared, BLM has removed far more wild

horses from the range.  Indeed, since 2009, it has removed over 37,000 additional wild horses, and

plans to remove many more in the next several years.  See 2009 - 2013 Gather Schedules (J).

Moreover, according to the BLM's own data, there are now almost 50,000 wild horses in holding

facilities versus fewer than 32,000 that remain free in the wild.[6]

While this creates enormous costs to the government, id.   also at taxpayer expense   it is

also an extremely inhumane way for these wild animals to live their lives, spending up to several

years in overcrowded pens in feedlot conditions, then sent to long-term holding facilities where

they are unable to engage in natural behaviors or live in natural social/family groups, or worse,

being sold or adopted into the slaughter pipeline.  See ProPublica (Sept. 28, 2012) "All the

Missing Horses:  What Happened To The Wild Horses Tom Davis Bought From the

Government?" (Exhibit K).[7]

---

[6] See http://www.blm.gov/pgdata/etc/medialib/blm/wo/Planning_and_Renewable_
Resources/wild_horses_and_burros/statistics_and_maps/holding__adoption.Par.3899.File.dat/Fa
cility%20Reports%2010-10%20-%201-13.pdf (49,509 wild horses in BLM short and long term
holding facilities as of January 2013); see also http://www.blm.gov/wo/st/en/prog/whbprogram
/history_and_facts/quick_facts.html (There are about 31,500 wild horses left free on the range).

[7] The GAO Report found that the costs for short-term holding were expected to increase
from about $11.2 million to $16.2 million, and that  "spending on long-term holding" for
unadopted horses "has increased from about $668,000 in 2000 to more than $9.1 million in
2007."  AR 01531, and that "with the long-term holding facilities at full capacity . . . more wild
horses are spending a longer time in the more expensive short-term holding facilities."  Id.

**6.      The Intervenors Have Been Excluded From The Various Notice Provisions Included In The Decree.**

There are several places in the Consent Decree that require the federal government to keep RSGA informed of certain facts or events that may be relevant to carrying out the obligations outlined in the Decree, which do not also require that such information be provided to the Intervenors.  These include paragraph 3, which requires BLM each year "[n]o later than November 30 " to "report to RSGA . . . the results of the wild horse census results for Salt Wells/Adobe Town, Divide Basin, and White Mountain areas."  That paragraph also requires BLM to "provide RSGA notice on [sic] when the gathers will occur to remove wild horses as provided in paragraph 4."  Similarly, paragraph 9 of the Decree provides that in the event of a disagreement between RSGA and BLM "concerning the interpretation or performance of any provision" of the Decree, "a Party shall invoke the dispute resolution procedures of this Section by notifying the other Parties in writing of the matter(s) in dispute and of the Party's intention to resolve the dispute under this Section."  It further provides that if the Parties cannot resolve a dispute, "the Party seeking interpretation or performance may file a motion for relief or enforcement with this Court."

These provisions of the Consent Decree should not be approved without providing that all such notices and information shall also be provided to counsel for the Intervenors.  In addition, it should be made clear that the Intervenors will be provide notice of all attempts to "construe, implement, or enforce the terms" of the Consent Decree, see ¶ 8, as well as notice of all such dispositions.  As parties of right to this action, the Intervenors should have a right to all such information, as well as all other actions taken pursuant to this Decree, as all such actions affect

their legal rights and interests in preserving the wild horses that live on the Wyoming Checkerboard.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, the Consent Decree entered into between the federal defendants and RSGA should not be approved as written.  Intervenors respectfully request an opportunity for a hearing on these matters before the Court issues a final decision.

Respectfully submitted,

/s/
Katherine A. Meyer
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

Timothy Kingston
408 West 23rd Street, Suite 1
Cheyenne, WY 82001-3519
(WY Bar No. 5-2476)
(307) 638-8885

Attorneys for Intervenor-Defendants

Date:   February 25, 2013

-26-