FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 APR  3  AM 10 05
STEPHAN HARRIS, CLERK
CHEYENNE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

| | |
|---|---|
| ROCK SPRINGS GRAZING ASSOCIATION, a Wyoming Corporation,<br><br>      Petitioner,<br><br>      vs.<br><br>KEN SALAZAR, in his official capacity as Secretary of the Department of the Interior; *et al.*,<br><br>      Respondents,<br><br>    and<br><br>AMERICAN WILD HORSE PRESERVATION CAMPAIGN, *et al.*<br><br>      Respondent-Intervenors. | Case No. 11-cv-263 |

---

**MEMORANDUM OPINION GRANTING JOINT MOTION TO DISMISS**

---

This matter comes before the Court on a joint motion to dismiss filed by Petitioner

Rock Springs Grazing Association (RSGA) and Respondents (collectively BLM) pursuant

to Federal Rules of Civil Procedure 41(a)(2) and the terms of the Consent Decree and Joint

Stipulation for Dismissal (Consent Decree). Document (Doc.) No. 81; 81-1. For background purposes, RSGA filed this case requesting the Court direct the BLM to remove all of the wild horses that had strayed onto the RSGA lands within the Wyoming Checkerboard, which is a strip of land containing approximately two million acres of private and federal land following the railroad from Tipton to Bryan, Wyoming. The BLM resisted, advancing various reasons why the Court could not grant the relief requested. The BLM also argued it met its legal obligations by past actions, and by making arrangements to remove wild horses from RSGA lands. At the hearing, RSGA and the BLM requested the Court defer ruling, to afford the parties an opportunity to engage in settlement discussions. After some delay, RSGA and the BLM resolved their differences and filed a Joint Motion to Dismiss with Consent Decree.

The International Society for the Protection of Mustangs and Burros, the American Wild Horse Preservation Campaign, and The Cloud Foundation (Intervenors) received a copy of the Consent Decree on January 11, 2013. Doc. No. 81, ¶ 6. The Joint Motion to Dismiss Case with the Consent Decree was filed with the Court on February 12, 2013. On February 25, 2013, Intervenors filed their opposition to the terms of the Consent Decree. Doc. No. 86. The Court has considered the filings and is otherwise informed in the premises, and will grant the Joint Motion to Dismiss and approve the Consent Decree in the form provided.

BACKGROUND

A.   *Wild Free-Roaming Horses and Burros Act*

The Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331- 1340 (the Wild

Horses Act), recognizes that "wild free-roaming horses and burros . . . belong to no one

individual.  They belong to all the American people."  S.Rep.No. 242, 92d Cong., 1st Sess.

1 (1971).  "In structure and purpose, [the Wild Horses Act] is nothing more than a land-use

regulation enacted by Congress to ensure the survival of a particular species of wildlife."

*Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423, 1428 (10th Cir. 1986).

Reflecting this, the Wild Horses Act directs the Secretary to provide for the protection and

management of these animals.[1]  As such, it is "reasonably related to the promotion of the

public interest."  *Id.* at 1430.

The BLM administers the Wild Horses Act as the Secretary's delegate. Because the

Wild Horses Act prohibits the harassment of wild horses when it is done "maliciously," 16

U.S.C. § 1338(a)(3), it is not entirely clear what measures may be taken by landowners to

protect their land from wild horses without risk of sanctions.  It is clear, however, that

---

[1] "The principal goal of [the Wild Horses Act] is to provide for the protection of the
animals from man. . . ."  S.Rep.No. 242, 92nd Cong., 1st Sess., reprinted in 1971 U.S. Code
Cong. & Admin. News 2149, 2151.  Further, the protection of the wild horses and burros on
public lands was upheld as a proper exercise of congressional power under the Property Clause in
*Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

Section 4 of the Wild Horses Act, 16 U.S.C. § 1334 (Section 4), entitles landowners to enjoy the use of their property unencumbered by wild horses, and provides them a specific remedy to remove the animals. If wild horses "stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshall [sic] or agent of the Secretary, who shall arrange to have the animals removed." *Id.* The BLM has interpreted this statutory provision by promulgating regulations, which provide: "Upon written request from the private landowner to any representative of the [BLM], the authorized officer shall remove stray wild horses and burros from private lands as soon as practicable." 43 CFR § 4720.2-1.

The operation and benefits of Section 4 of the Wild Horses Act has been described as follows:

> The removal of the animals is primarily for the benefit of the public in that it keeps wild horses and burros on public lands. As a byproduct, the landowner has the benefit of having the animals removed from his land without cost and by merely reporting to the government that they are on his land. This byproduct also works to the benefit of the public. Because the landowner has an easy and cost-free way to remove the animals, he will not be tempted to shoot or otherwise harm them. Accordingly, less animals will be maimed or killed.

*Roaring Springs Associates v. Andrus*, 471 F.Supp. 522, 525-26 (D.Ore. 1978).

B.   *Section 4 Litigation*

Notwithstanding the Court's observations in *Roaring Springs*, litigation concerning Section 4 of the Wild Horses Act suggests that nothing is easy or cost-free to landowners

when it comes to removing animals.  RSGA is the landowner in this case.[2]  RSGA was

established in 1907 to assemble the land rights to use the rangeland resources within a

portion of the Wyoming Checkerboard, which at that time was owned by the government,

the Union Pacific Railroad, and the State of Wyoming. Doc. 1, ¶ 20. The RSGA land follows

the railroad right-of-way from Tipton to Bryan, Wyoming, encompassing an area roughly 40

miles wide and 80 miles long and containing slightly more than two million acres.  *Id.*

> The "checkerboard" derives its name from the pattern of alternating
> sections of private and public land which it comprises. The checkerboard
> scheme of land ownership is a result of the Union Pacific Act passed in 1862.
> Under that Act, the Union Pacific Railroad Company was awarded the
> odd-numbered lots of public land along the railbed right-of-way as the
> company completed each mile of the transcontinental railroad. Today, more
> than half of the checkerboard remains under federal ownership, while the
> remainder is held privately.

*Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423, 1424, fn 1 (10th Cir. 1986).

RSGA uses the Wyoming Checkerboard for grazing cattle and sheep.  Wild horses

also graze on the Wyoming Checkerboard and, because the Wyoming Checkerboard is not

---

[2] RSGA is considered by the Court to be the "owner" of the private land (generally the
odd numbered sections) within the Wyoming Checkerboard because RSGA either owns or
controls this land.  Private land not owned by RSGA is leased to RSGA by Anadarko Land
Corp., an amicus curiae in support of RSGA.  Doc. 64.

fenced, wild horses move freely throughout the area.[3]  The Wyoming Checkerboard is generally described as high desert, with limited forage, limited fences, and sensitive to overuse.

The instant controversy began years ago, shortly following enactment of the Wild Horses Act.  Relying on Section 4 of the Wild Horses Act, in 1977, RSGA formally requested removal of all of the wild horses from its private lands. A.R. 03316.  Unsatisfied with the BLM's response, in 1979 RSGA and the Mountain States Legal Foundation filed suit to compel removal in addition to other relief. A.R. 00858-59.

In 1981, the Court entered an order which found that "the wild horse population has dramatically increased and the excess demand on grazing lands has created severe problems for ranchers in the Rock Springs area and the ecological balance of the range." A.R. 00870. For purposes of this case, the relevant part of the 1981 Order provides "that the Rock Springs District office of the [BLM] shall within one year from the date of this Order remove all wild horses from the checkerboard grazing lands in the Rock Springs District except that number which the [RSGA] voluntarily agrees to leave in said area."[4]  *Id.*

---

[3] The Wyoming Checkerboard is crucial winter range habitat for horses, although animals can be found there year long.

[4] Prior to filing the 1979 lawsuit, RSGA reached an agreement with two wild horse advocacy groups.  RSGA agreed to tolerate 500 wild horses on the Wyoming Checkerboard and

Following the 1981 Order, the BLM began its NEPA process and established herd management areas (HMAs) throughout the Rock Springs District to include a total of 1,525 wild horses (AMLs).[5] Doc. 1, ¶ 32; A.R. 01899; A.R. 01780; A.R. 01948; A.R. 01848; A.R. 02130. The BLM undertook wild horse gathers to meet this objective. In 1984, RSGA filed a motion to enforce the 1981 Order, and the parties stipulated to an amended order whereby the BLM committed to the removal of all but 1,500 to 1,600 wild horses.[6] Doc. 1, ¶¶ 34 & 47; A.R. 03350-56 & 03359. The BLM also committed to dedicate about 90% of the Wyoming BLM wild horse program funding for the following three years to achieve and maintain the AMLs. *Id.*

---

1,000 on the public land to the north and south of the Wyoming Checkerboard, totaling 1,500-1,600 wild horses within the entire Rock Springs District. A.R. 03329-30. Shortly after this agreement, the BLM shut down the wild horse gather program indefinitely, citing lack of funding. A.R. 03335. This prompted RSGA and Mountain State Legal Foundation to file suit.

[5] AMLs refers to "apparent management numbers." The wild horse population objective of 1525 AMLs was divided into the following HMAs (Doc. No. 1, ¶ 32):

| | |
|---|---|
| Big Sandy Solid Block | 600 |
| Salt Wells Checkerboard (RSGA lands) | 500 |
| Salt Wells Pilot Butte Solid Block | 400 |
| Pinedale | 25 |

[6] Given that the initial HMAs have changed over time, the 1500-1600 wild horses are considered within the four Rock Springs HMAs that include RSGA lands and the HMAs adjacent to RSGA lands. Doc. 1, ¶ 47.

In 1985, the BLM estimated the wild horse population was nearing the 1,500-1,600 level, and wrote to RSGA to document compliance with the 1981 Order. A.R. 03373 ("Rock Springs District is in compliance with the Court Order of March 31, 1981 and amendments. I now consider our Wild Horse Program to be in management mode instead of a roundup project."). RSGA neither acquiesced in, nor contested this determination.[7] Doc. 1, ¶ 36.

In 2003, the State of Wyoming filed suit against the BLM to enforce the terms of the respective land use plans governing public lands in Wyoming. A.R. 01262-86. A Consent Decree was entered whereby the BLM agreed to maintain the AMLs for each HMA, and to

---

[7] The BLM invited RSGA to observe the horses and challenge BLM's data, to conduct an independent inventory, or to accompany the BLM staff in its February 1986 inventory. A.R. 03373. Following the February inventory, the inventory of horses was estimated by the BLM at 1,737, which the BLM concluded "is within the presumed allowable fluctuation of population, 1,296 to 1,754." *Id.* at 3379-80. Again, the BLM invited RSGA's concurrence with its declaration and "the hopeful final resolution of this court order." *Id.* No response appears in the record.

inventory and gather from each HMA every three years to the lower level of the AML.[8]  A.R.

01287-95.

The BLM initially instituted the steps required under the consent decree and gathered

and removed wild horses from the HMAs that were within or bordered the RSGA lands. *Id.*

at ¶ 45; A.R. 02218.  However, in 2009 and 2010, the BLM removed very few wild horses,

but planned and executed a large removal in calendar-year 2011, gathering over 3,400 horses.

A.R. 02218; A.R. 04082.

Notwithstanding the BLM's efforts, RSGA alleges that the estimated number of wild

horses located in the HMAs encompassing the RSGA lands greatly exceed the previously

agreed range of 500 horses within the RSGA lands and no more than a total of 1500 to 1600

wild horses within the four Rock Springs HMAs that include RSGA lands and the HMAs

adjacent to the RSGA lands.  RSGA also alleges the numbers exceed the AMLs (1445-1680)

---

[8] By this time the Green River Resource Management Plan, which governs public land management for the Rock Springs Resource Area, adopted the following HMAs and AMLs, with a total AML of 1,105 to 1,600 wild horses to be maintained among the listed five HMAs (to which RSGA had agreed and which were also incorporated in the Consent Decree) (A.R. 01065; 01115; 01289; Doc. 1, ¶¶ 39-40 & 42):

| | |
|---|---|
| Salt Wells | 251-365 |
| Adobe Town | 165-235 (only Rock Springs District Portion) |
| White Mountain | 205-300 |
| Little Colorado Desert | 69-100 |
| Great Divide Basin | 415-600 |

adopted in horse management plans and Resource Management Plans. *Id.* at ¶ 47.[9]  This

prompted the October 4, 2010 letter from RSGA to the BLM under Section 4 of the Wild

Horses Act, demanding the removal of all wild horses from lands it owned or leased. A.R.

01427-29.

    After receipt of the October 4th letter, the BLM responded explaining that its gather

schedule for wild horses "is based on available funding for [the] Fiscal Year and the

priorities set by the states" that "[c]urrently for FY2011, BLM is not funded to accomplish

[the] task" of "remov[ing] all wild horses from [RSGA's] private land, including the land

within the Divide Basin HMA;" that "[h]owever, the Divide Basin HMA issue is the highest

Wyoming priority for FY2012;" that "BLM Wyoming has started the NEPA process" to deal

with the matter; and that it intends to request that this matter "be placed on the FY2012

gather schedule at the earliest possible date, based upon appropriations." A.R. 01430-31.

The BLM further explained that the agency "continue[s] to manage wild horses and

---

    [9]RSGA estimates that, when its petition was filed, there were approximately 3,680 wild horses within the Rock Springs District. Although the BLM gathered and removed wild horses in 2011, RSGA contends that the wild horse numbers still exceed the AMLs. Doc. 61, p. 23. This allegation is supported by a BLM internal working document dated March 31, 2011 whereby the BLM State Director estimated that horse numbers exceed AMLs in 11 of 16 HMAs. A.R. 02167. RSGA's specific calculations concerning excess animals are contested. Notwithstanding whether the horse numbers exceed the AMLs and if so, by how much, there is no dispute that wild horses have strayed onto RSGA's lands and that RSGA has made a valid request under Section 4 for the removal of all wild horses from its lands.

associated habitats in accordance with the Green River Resource Management Plan (RMP) . . . its objectives, applicable laws, regulations, and policies," and that "[t]he Rock Springs Field Office is currently updating the RMP in which wild horse management will be addressed and AMLs will be re-evaluated." *Id.* The BLM did not say it would proceed to make arrangements to remove all wild horses from RSGA lands.

Thus, RSGA filed this case on July 27, 2011, which prompted a motion for Intervention by the International Society for the Protection of Mustangs and Burros, the American Wild Horse Preservation Campaign, and The Cloud Foundation on September 28, 2011. Doc. No. 1, 16. Finding that these groups have a legally protectable interest in protecting the wild horses that live on the Wyoming Checkerboard, which could be impaired by the lawsuit, and that there is a divergence of interests between these groups and the BLM, the Court granted intervention. Doc. No. 32. The dispute then went to hearing on September 17, 2012, with the ruling deferred pending settlement discussions between RSGA and the BLM.[10] Doc. No. 76, 77.

---

[10] Intervenors allege they were not allowed to participate in any way as to the substance of the Consent Decree. Doc. No. 86-1, p.4.

C.    *Consent Decree*

On February 12, 2013, RSGA and the BLM filed a Joint Motion to Dismiss Case with Consent Decree.  In summary, among other things, the Consent Decree provides:

a. the BLM agrees to remove the wild horses from the RSGA lands;

b. the BLM agrees to initiate a process to consider appropriate changes in the HMA boundaries that currently include RSGA lands and to consider revision of the respective numbers of wild horses as expressed by AMLs;

c. RSGA agrees to accept on its lands within the Wyoming Checkerboard up to 205 to 300 wild horses within the White Mountain Herd Management Area subject to the BLM's agreement to institute fertility control measures and to keep the numbers to the lower range of the agreed-upon numbers.

RSGA and the BLM argue for approval by the Court of the Consent Decree, which provides for a ten-year term with the Court retaining jurisdiction.  RSGA and the BLM argue the Consent Decree is fair, adequate and reasonable based on the facts presented in this case. They argue it supports the public policy favoring settlement of a dispute and it serves the objectives of the Wild Horses Act, by retaining wild horses on the public lands while reducing landowner conflicts where the wild horses stray onto private lands.  In addition, RSGA and the BLM argue the Consent Decree promotes the public interest in providing that

12

future decisions concerning the wild horse areas and numbers will occur through a public process whereby HMA boundaries and AMLs will be considered for revision in accordance with applicable federal laws, which will afford Intervenors and other interested parties an opportunity to comment to the BLM with respect to changes, and to appeal any final agency action.

Intervenors argue the Consent Decree should be rejected because the Court lacks jurisdiction over RSGA's claims, and because it "adversely affects the legal rights and interest" of the Intervenors in many respects. *Johnson v. Lodge #93 of the Fraternal Order of Police*, 393 F.3d 1096, 1107 (10th Cir. 2004).

## ANALYSIS

*A.*    *Subject Matter Jurisdiction*

A consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction.   Therefore, Intervenors' jurisdictional arguments must be addressed first.   Intervenors argue the positions from the briefs that, in the wake of *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66-67 (2004), RSGA cannot obtain a Court order requiring the BLM to remove any horses from the public lands, because the BLM has wide discretion with regard to its "broad statutory mandate" to "manage wild free-roaming horses and burros," under the Wild Horses Act.   The BLM responds that the Court need not

affirmatively resolve the subject matter jurisdictional arguments from the briefs to enter the Consent Decree.  Rather, the Court has jurisdiction to enter the Consent Decree provided that RSGA's claims are not "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 89 (1998)(quoting *Oneida Indian Nation of N.Y. v. Oneida County*, 414 U.S. 661, 666 (1974).  The BLM acknowledges that RSGA's claims meet this minimal standard.

The Court agrees with the BLM as to RSGA's claims grounded in 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 1361 (mandamus), and 5 U.S.C. § § 701-706 (APA).  Doc. 1, ¶ 10 & p. 31.  It seems without question that this case requires an interpretation of the Wild Horses Act, which is clearly basic and in the forefront of this dispute.  The parties may disagree about the proper interpretation and application of *Norton*, as well as the role of the Court versus the role of the agency when a case is brought by a private landowner seeking a meaningful removal remedy following a demand under Section 4 of the Wild Horses Act.  Nonetheless, any such disagreement does not deprive this Court of jurisdiction to consider the Consent Decree in the context of the motion to dismiss.

With this said, however, the Court does not agree that it has jurisdiction to enforce the 1981 Judgment and Order (as amended) under Rule 70 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651. Rule 70(a) provides "[i]f a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply within the time specified," and authorizes a court to "order the act to be done." The All Writs Act provides an equitable form of relief that is exercised where "necessary or appropriate in aid of [a court's] jurisdictions." 28 U.S.C. 1651(a); *Wis. Right to Life v. Fed. Election Comm'n*, 542 U.S. 1305, 1306 (2004) (explaining that the authority under the All Writs Act should be used "sparingly and only in the most critical and exigent circumstances"). Neither Rule 70 nor the All Writs Act confers jurisdiction. *Analytical Eng'g, Inc. v. Baldwin Filters*, 425 F.3d 443, 449 (7th Cir. 2005) (citing *Georgia Cent. Credit Union v. Martin G.M.C. Trucks, Inc.*, 622 F.2d 137, 139 (5th Cir. 1980) ("Rule 70 does not establish jurisdiction or venue); and *Commercial Sec. Bank v. Walker Bank & Trust Co.*, 456 F.2d 1352, 1355 (10th Cir. 1972) (the All Writs Act "does not operate to confer jurisdiction").

Consistent with this analysis, there is no legal basis to conclude the Court retained any jurisdiction in Case No. 79-275, or that the BLM has any continuing obligation to maintain the wild horse numbers associated with that case for any period beyond the removal program

criteria specified in the stipulated, amended 1981 Order for fiscal years 1984, 1985 and 1986. Because RSGA's complaints deal with the BLM actions and inactions well beyond these three fiscal years, the Court concludes that Case No. 79-275 is closed and it provides no jurisdictional basis for this case.

B.   *Legal Rights and Interests of the Intervenors - RSGA Lands*

The Intervenors argue it was a party to the earlier "agreement"[11] under which RSGA agreed to keep 500 horses on the private land in the Wyoming Checkerboard, which was incorporated by the Green River Resource Management Plan (RMP). The Intervenors argue that RSGA and the BLM cannot modify this earlier agreement without the approval of the Intervenors and an amendment to the RMP. More specifically, the Intervenors argue that the provision in the Consent Decree whereby the BLM agrees to remove all wild horses located on RSGA's private lands, including Wyoming Checkerboard lands, with the exception of those wild horses found within the White Mountain HMA, violates their legal rights and interests under the earlier "500 horses" agreement and the RMP.

As explained above, this case is not predicated on, nor restricted by any prior agreement. Even if the prior agreement between RSGA and the Intervenors had been entered by the Court as a Consent Decree, which it was not, that would not limit the Court's

---

[11] *See* footnote 4 supra.

16

discretion or authority.  Courts retain power to modify earlier consent decrees and "a sound judicial discretion" may call for such modification "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have arisen." *System Federation No. 91 v. Wright*, 364 U.S. 642, 646-647 (1961).

The Court will next turn to Intervenors' argument that the Consent Decree is inconsistent with the RMP, which is binding on the BLM unless and until it is amended. Specifically, Intervenors object to the BLM's agreement to remove all wild horses located on RSGA's private lands, including Wyoming Checkerboard lands, with the exception of those wild horses found within the White Mountain HMA, in accordance with the schedule contained in Paragraph 5 of the Consent Decree.  Intervenors argue there is no way to distinguish between horses on "private" lands and those on public lands and thus it would be impossible for the BLM to make this agreement without infringing on Intervenors' rights to maintain wild horses on the public lands to the greatest extent possible consistent with the RMP.

While the Court fully appreciates the land management challenges[12] presented by checkerboard ownership, those problems do not deprive RSGA of its rights as a private landowner under Section 4 of the Wild Horses Act, nor the deference due the BLM as the agency with substantial expertise in the management of the HMAs. The BLM is statutorily obligated to manage wild horses in this area consistent with RSGA's Section 4 legal rights notwithstanding the RMP herd management objectives for federal land, or the particular management challenges presented.

In this instance, it is important to note that the Consent Decree allows the BLM to maintain certain numbers of wild horses on RSGA's private lands notwithstanding RSGA's Section 4 rights.[13] This is a far cry from the relief requested by RSGA, which was removal of all of the horses from RSGA's lands. Given the statutory rights afforded RSGA under

---

[12] "A [BLM] district manager once suggested that had Congress deliberately planned to construct a land tenure pattern as difficult as possible to administer it probably could not have devised anything worse than the checkerboard arrangement." Wesley Calef, *Private Grazing and Public Lands* p. 167 (Chicago: U of Chicago Press, 1960).

[13] Under the terms of the Consent Decree, RSGA will allow wild horses on its private lands within the White Mountain HMA at the current AML of 205-300. Also, RSGA's Section 4 rights are affected by the gather schedule for all HMAs. The BLM has no obligation to prepare to remove wild horses from the Wyoming Checkerboard lands within the respective HMAs until the population is estimated to exceed 200 wild horses for Salt Wells/Adobe Town areas combined or 100 wild horses for Divide Basin. Finally, the yearly gather/removal commitments are identified as Salt Wells and Adobe Town HMAs in 2013, Divide Basin HMA in 2014, and White Mountain HMA in 2015 with additional gathers in 2016 if necessary.

Section 4, the Court cannot conclude that the Consent Decree is either contrary to Intervenors' rights and interests, or is unfair or unreasonable as to RSGA's private lands.

C.     *Legal Rights and Interests of the Intervenors - Public Lands*

Intervenors argue the Consent Decree is contrary to their rights and interests in keeping wild horses on public lands to the greatest extent permitted by law and, until and unless the BLM can make the "excess" determination required by the Wild Horses Act. Intervenors argue the Consent Decree is illegal because the statutorily required decisions have not been made pursuant to law, namely that an overpopulation exists and that the wild horses slated for removal are "excess animals."

For example, Intervenors point to provisions of the Consent Decree which specify that "[i]f BLM determines . . . that the wild horse population in the Adobe Town or White Mountain HMAs is likely to exceed the respective AML, the BLM shall adjust its annual work plan to gather and remove excess wild horses from the HMA(s) so that the population is reduced to the low end of AML." Doc. No. 81-1, ¶ 4. Intervenors also complain about the provision that "[i]f BLM determines . . . that the population in the Checkerboard lands is likely to exceed 200 wild horses for Salt Wells/Adobe Town Areas combined or 100 wild horse for Divide Basin, the BLM shall prepare to remove the wild horses from Checkerboard lands within the respective areas." *Id.*   Intervenors also complain about the provisions

relating to the use of fertility controls to suppress the population growth of the horses. *Id.* at ¶ 2. Intervenors argue that these decisions must be made only after an "excess determination" is made pursuant to the Wild Horses Act, and only as part of the BLM's broader resource plan for the public lands in question, which requires public notice and comment as well as review under the requirements of NEPA. Finally, Intervenors argue that the provisions of the Consent Decree which anticipate scoping under NEPA to consider certain proposed changes to the RMPs for the Rock Springs and Rawlins Field Offices[14] violate NEPA by limiting the BLM's choices of reasonable alternatives.

As to the provisions of the Wild Horses Act, Intervenors provide no authority for the argument that the BLM cannot engage in gather or fertility control programs unless or until an "excess" or overpopulation determination is made. Among other obligations, the Wild Horses Act directs the Secretary to protect and manage wild horses "as components of the public lands" and "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). A current inventory is required and one purpose of the inventory is to "make determinations as to whether and

---

[14] The Consent Decree provides for the BLM to undertake the process to consider the option of revising the HMA boundaries and the AMLs for what are now the Salt Wells, Great Divide Basin and part of Adobe Town HMAs. Doc. No. 81-1, ¶ 6. The BLM also commits to consider an amendment to the RMP to manage the White Mountain herd as non-reproducing. *Id.* at ¶ 6.d.

where an overpopulation exists and whether action should be taken to remove excess animals." 16 U.S.C. § 1333(b). The Consent Decree provides for an inventory (wild horse census) for the HMAs at issue, and provides for gathers when the census results and projected reproduction rates show the HMA is likely to exceed the respective AML. Doc. No. 81-1, ¶¶ 3-4. This process is not inconsistent with the Wild Horses Act.

Further, Intervenors do not adequately support their argument that the Consent Decree requires amendment of the Green River RMP and compliance with NEPA. The AMLs for the HMAs are established in the Green River RMP and no party has identified how, if at all, these AMLs are changed by the Consent Decree. Further, the Green River RMP expressly provides for selective gathering programs to be implemented in each of the wild horse HMAs, to include fertility control. A.R. 01065. While the Consent Decree is more specific than the RMP concerning when gathers will occur and how fertility control may be utilized, this specificity is not, on its face, inconsistent with the Green River RMP or NEPA principles.

As to paragraph 6 of the Consent Decree which anticipates scoping under NEPA for the purposes of considering proposed actions, Intervenors argue this violates NEPA by limiting the BLM's options. Regulations provide that while the NEPA environmental impact statement process is underway, an agency will take "no action . . . which would . . . [l]imit

21

the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a). As to this argument, however, the Consent Decree expressly prohibits any construction which would "limit or modify the discretion accorded to BLM by the applicable federal law and regulations, including but not limited to the [Wild Horses Act]; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 et seq.; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq.; the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq.; or general principles of administrative law with respect to the procedures to be followed in carrying out any of the activities required herein, or as to the implementation or conduct of any of the activities required herein." Doc. No. 81-1, ¶ 10.

The issue of whether the Consent Decree actually limits the BLM's discretion will turn on the implementation and force of the Decree, which is unclear at this juncture. At this point, deciding how - and even whether - paragraph 6 of the Consent Decree may affect Intervenors' rights and interests in wild horse management on public lands, would require the Court to engage in speculation and guesswork. Based on the undeveloped record presented, the Court concludes that the Consent Decree is not inconsistent on its face with the resource management or NEPA processes, and Intervenors' arguments on this point are not ripe for adjudication. Further, reaching the merits of Intervenors' contentions would inappropriately interfere with further administrative action. In short, at this juncture,

adjudicating the issues raised by the Intervenors as to the effect of the Consent Decree on the agency's statutory obligations would, to some degree, preempt the BLM's ability to implement the Decree in a manner consistent with its organic statutes. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted). This is precisely the situation before the Court.

D.     *Livestock Use on Public Lands*

Intervenors argue against approval of the Consent Decree based on their view that it illegally elevates the interests of private livestock owners over the interests of Intervenors. Intervenors point to statements in declarations supporting their contentions that livestock use is more detrimental to public lands than wild horses. Intervenors also argue that livestock owners use public resources at taxpayer expense for a fraction of the commercial market price.

This lawsuit and the Consent Decree concern wild horse management, not livestock management. With that said, however, the Court recognizes that there will always be a tension in balancing the objective of maintaining viable, healthy wild horse herds and the objective of maintaining and protecting other resource uses including livestock use. Whether the Consent Decree adversely or illegally affects this balance rests upon contingent future

events that may not occur as anticipated, and indeed may not occur at all. Therefore, Intervenors' claim that the Consent Decree is illegal on this basis is not ripe for adjudication.

E.    *Effect on Wild Horses*

Intervenors argue the Consent Decree will have extreme consequences for Wyoming Wild Horses. This argument appears to be based on Intervenors' view that the BLM will adopt the alternatives identified in paragraph 6 of the Consent Decree. For the reasons stated above, this contention is not ripe for adjudication.

F.    *Failure to Provide Notice/Information to Intervenors*

Intervenors argue that the Consent Decree requires the BLM to inform RSGA of certain facts or events, without requiring similar information to be provided to Intervenors. These notices deal with census results, horse gather schedules, and notice of disagreements. The Court would note that Intervenors will receive notice of any filings in this docket.

The Court cannot conclude that a failure to include Intervenors in the notice provisions renders the Consent Decree unfair, unreasonable, illegal or against public policy. Further, Intervenors are not required to participate in any informal dispute resolution process as a precondition to seeking relief from the Court. Therefore, Intervenors stand in an enhanced position in the event they have a disagreement concerning the interpretation or performance of the Consent Decree.

CONCLUSION

Based on the foregoing, the Court approves the Consent Decree as a fair, reasonable, equitable and adequate settlement of RSGA's claims against the BLM, and which does not on its face violate the law or public policy.

IT IS ORDERED that the Joint Motion to Dismiss is GRANTED.  All the provisions in the Consent Decree and Joint Motion to Dismiss are hereby incorporated by reference, approved, granted and expressly made an order of this Court.

IT IS FURTHER ORDERED that the terms and the conditions of the Consent Decree and Joint Motion to Dismiss are hereby APPROVED, and the Petition is hereby DISMISSED with prejudice subject to the terms and condition of the Consent Decree and Joint Motion to Dismiss.

IT IS FURTHER ORDERED that Court will retain continuing jurisdiction of this action consistent with the terms of the Consent Decree.

IT IS FINALLY ORDERED that the parties will bear their respective costs and attorney fees incurred herein.

Dated this ___3___ day of April, 2013.

NANCY D. FREUDENTHAL
CHIEF UNITED STATES DISTRICT JUDGE

25